A felony conviction in this case resulted from the violation of a posted sign with only five words on it, left lane for passing only. This sign... Absolutely the weakest pretextual stop I've ever seen and we've seen a lot of them. Not only that, the sign was 12 miles away from the location of the stop. As noted in the brief, this was in Deep South Texas on the way to Edinburgh, Texas. Traveling in the left lane for 14 additional seconds, that could have killed scores of people, couldn't it? It's an exceptionally dangerous situation on a four lane divided highway. I'm being sarcastic. Yes, well, I would agree that that would... There's not a question that there was a danger to the driving in the left hand lane. She was not speeding, which is probably one of the strong points that I might point out where there were no other causes for the stop. Additionally, there were several credible legal reasons for driving in the left hand lane. Under Texas law, a driver is required to move over to the left lane, vacate the nearest lane in the case of an emergency vehicle with its lights on, as the court can see in the video that was occurring. Additionally, she was moving to avoid... You can be in the left hand lane when you're avoiding striking and obstruction and there is a car crossing the highway, this highway, although there is a 75 mile an hour speed limit, does have crossovers throughout it. So in addition, I would say that there was no reasonable suspicion for the initial stop for driving in the left hand lane in violation of the sign. Let me ask you one thing about... So putting aside whether we agree or disagree with this Texas statute about the left lane, it is what it is and nobody disputes that. There's been this big discussion about where the sign was. Let me ask you hypothetically, so moving away from this case and just talking in general. As you mentioned, deep south Texas, Texas itself, big state, you can go miles and miles and not see an exit. And so is that relevant? In other words, not just where is the sign, but how likely is it that somebody passed the sign because the stops, if any, between the sign and the pulling over are either not there or they're just going to, you know, a rural area that no one would be getting on or off. Do you see what I'm saying? Is that an aspect that can be looked at? I would agree with the court that it is extremely unlikely that someone, a patrol officer, is going to see the person pass the sign. And now the case law, I believe it was in the Castillo case, does state that there is not certainty required, the only reasonable suspicion. Another problem, it seems to me, from your perspective is, correct me if I'm wrong, but I believe the Texas statute says a violation has occurred or is about to occur, or may be about to occur. It's conceivable that it was about to occur. I believe that the trooper did testify that there was another, there was another sign was going to be located a little further up the road. But what about my question, let's just say hypothetically that the sign was 12 miles before the person was pulled over, however, there was no exit or entrance for that 12 miles. Would that be something the district court can and should consider, and that the police officer can and should consider in determining reasonable suspicion? Yes, I believe that they can, can, should, and to some degree, you know, tried to do the location. Interestingly, the record would reflect that after the, the record would reflect that the district judge was surprised at the, at the extent of the law, and after, even after he ruled, he appeared to be surprised again, you know, that, when reminded that it was, had been 12 miles away. The, this court in Castillo, following the court, the Texas criminal court in Abney State that, in the Abney case, it said that 15 miles away from the sign was too far. The, additionally, though, the Abney case did, you know, indicate that the presence of a credible alternative reason, the court used the hypothetical example of no entrance or exit, but in, in this case, we don't have to look for a hypothetical credible reason. There was testimony, and the video evidence would show the additional reasons why she might be driving in the left-hand lane. Additionally, she did pass the, the Texas DPS trooper who was traveling relatively slowly in the right-hand lane, and shortly thereafter, that is when the stop occurred. The, and so the, while, while the, so all the, all that could be seen in the, in the video evidence. There isn't a dispute as to the location of the sign. I would point out to the court that the extent of the Texas law does not criminalize the, the traveling in the left-hand lane between, between signs. According to the Texas Court of Criminal Appeals, the violation is violation of the sign, not any separate law for driving in the left-hand lane. Right, but we, we don't, let's say she had confessed to passing the sign, that would have been good enough. Even if it was 20 miles away, she'd go, oh man, I saw that sign. Okay? So the, the 15 miles and the 12 miles and the five miles and all of these miles are because what's the likelihood that you passed the sign? And so that was why my original question was, I could see, like, if you're driving through Dallas on, you know, 45, you're coming up the South Dallas, you're going to have a ton of exits and entrances. So if there's some sign there, which I hope there's not, because everybody drives in the left lane, but if there's some sign there, we don't know if you saw it or not, because you're getting on, getting off. But if you're driving to, say, Houston from Dallas on 45, you can go 10, 20, 30 miles and maybe not even see an exit, or maybe just an exit that literally goes nowhere, it goes to maybe a farmland. So that's why I was asking that, because I think, I think there's more to the question of the, of the reasonable suspicion than simply how far away was the sign, unless I'm missing something. The, additionally, the, in addition to the reasonable, to the fact that there was no reasonable suspicion for the initial stop, we also have a question that there was no reasonable suspicion for the continued questioning after she had been, had been pulled over. Well, it seems to me, though, that, that the facts here are consistent with facts where we've said that the continuing questioning was okay. Things like inconsistent answers by the occupants, for, for example, are always looked on as a reasonable basis for the officer to continue to ask questions to see whether something is afoot. There are a few interesting issues to, to the questioning, primarily that of the, the fact that he interviewed Erica Rodriguez inside the patrol car. He did, he did note that that was, there was, you know, reasons for officer safety and reduced noise and the like. The, but as, as you can see from the transcript of the questioning in the, in the record, the questioning was, was somewhat meandering and they talked about buying a present for, for her son, talked about her mother, the, and then, you know, he directed the questioning back to what he, he was really, you know, trying to, to find, you know, are you carrying any drugs, weapons, large amounts of money? The, the district judge commented that, that the trooper is very good at his job. So, you know, to credit the trooper, he did, he did discover the, he did get Erica Rodriguez to make an admission during the course of this questioning. But the, during the course of the questioning, it all, it all started with the question about whether there was reasonable suspicion for the stop for driving in the left-hand lane and whether there was reasonable suspicion for continuing the questioning after the five or ten minutes that he said would require a, you know, a warning to be, to be issued, which he did indicate that he was going to do. The, now the, as the, as the, 13 minute stop, is that right? Yes, sir. So, one of the factors he looked at was the absence of any luggage, is that, is that correct? Because we, we've seen that before as a factor. Yes, he, he did note some of the factors of absence of luggage, he, he did, he did approach the passenger first, interestingly enough, to begin the questioning, and he did note that they gave inconsistent answers about from where they were coming from and how they, how they knew each other and the, and the timing of their, of their trip. The, while nervousness is a, is a, is a factor in the questioning, I believe the court has, has noted that nervousness by itself is, is not enough. The, there has to be some more, you know, some more articulable facts and the reasonables to develop this reasonable suspicion. The, I would, I would state that I believe that this was more of a generalized suspicion that, that eventually rose to, to a, under this continued questioning, the, and the, it was, and that the reasonable, and the, that the facts, the facts do show a defense for the initial, for the initial stop in the, the driving in the left-hand lane by itself should not have been the reasonable suspicion for this, this initial stop and that by making this continued questioning of Erica Rodriguez, that resulted in the, in the, in the admission of the contraband, the weapons that were in the trunk of the car. The, so we would request, as the procedural history went, this matter was one that once the, once the motion to suppress was denied, that there was only a very summary bench trial where she was found guilty. She was sentenced to 82 months in prison where, and she did receive a role adjustment for her, her, of minus three in this matter, that, but the reason for the appeal is the reasonable suspicion for the stop and the reasonable suspicion for the continued questioning. We would find that, we would ask the court to find as a matter of law that the, there was no reasonable suspicion for the initial stop, and even if there were, that there was no reasonable suspicion for the continued questioning past the time it would take to issue the one citation. Okay. You've saved time for rebuttal, Mr. Turley. Pardon me? You've saved time for rebuttal. Yes. Nothing further. Okay. Thank you. Thank you. Ms. Wilson? Welcome back, Ms. Wilson. How many Fifth Circuit arguments for you now? Have you lost count? Ah, yes, sir, but I think Mr. Berry behind me has had a lot more than I've. I always ask Mr. Berry how many it is, and so I see him shaking his head back there, so he'll. Well, may it please the Court. The district court in the instant case properly denied Rodriguez's motion to suppress. Trooper Rivero had reasonable suspicion that Ms. Rodriguez had committed a left lane violation. The question here isn't whether Rodriguez was guilty, but whether the officer had reasonable suspicion. As this Court knows, reasonable suspicion is a low threshold. Trooper Rivero did not have to see her pass the sign. Prior case law tells us that. But the sign had to be at or near the place of the violation. That's correct. That's correct. However, reasonable suspicion is a low standard. And here, because Texas doesn't have rules or laws regarding the spacing of the signs, and based on Supreme Court precedent, we look at the facts, and we look at the totality of the circumstances, which segues into what you were asking, Judge Haynes, in relation to do you just look at distance. And the answer is no. The Supreme Court and this Court has told us that facts matter. Totality of the circumstances matter. Deference to local law enforcement and to local judges matter. And then, of course, we have the standard of review, which is that you review the facts in light of or the most favorable to the government. Here, what you had, and this Court has referenced it before, when Officer Rivera first noticed Ms. Rodriguez, she was about seven to eight miles from the sign. Prior cases have talked about when somebody is first noticed. And I realize cases also talk about, however, the distance between the sign and the stop. But it's important to know it was about seven to eight miles. Right. But let's go behind that. Excuse me for cutting you off. I don't mean to do that. But you say when the time that he first noticed her. But when he first noticed her, she was still legitimately passing. Isn't that right? That he would have seen her during the time when she still had reason to be in the left lane because she was passing? No. He first noticed her when she came up behind him in the right lane. And he was driving at a lower rate of speed because he was looking for seat belt violations and other types of traffic violations. Right. But at that time, she was doing nothing unlawful. That's correct, which also the inference can be made that maybe she knew she was supposed to be in the right lane. So he slows down even further. But the left lane can be used for passing. There's no doubt about that. That's correct. All right. So at what point in your view was she arguably in violation by being in the left lane longer than she should have been? Well, what happens is he slows down further. She moves to pass him. And as she's moving to pass him, if you see the video, you can see afar that there are flashing lights in the distance. She comes up upon that. And there's another officer who's pulled somebody else over. And in relation to what Mr. Turley said, that officer, however, was also talking to the people on the right side of the passenger side of the vehicle, which suggests that that is their training. And Officer Vivero said he was doing that here for his safety. But in any event, she passes him. And then as she's passing him, almost the other law enforcement officer, almost simultaneously, if you will, there is a truck who's coming from, whether you call it a median or a crossover or a turnaround, whatever you want to call it, there is a truck that's crossing straight in front of them at a distance, at a very safe distance. But the truck is pulling ahead, I mean, excuse me, pulling in front of them and then going over to the shoulder and then makes a right-hand turn. So presumably some type of local. And it is then, he, she drives for several more seconds and the officer, our officer Vivero accelerates and pulls her over. Judge, the lower court judge here, the district court judge, found that she had had the opportunity to pull back into the right lane and had not done so. And as I explained in the brief, the evidence showed here that both the court and the officer were familiar with the area. The area was rural. Officer Vivero said he regularly patrols that area and it's typically used for long-distance travel. In other words, there's, and Judge, excuse me, Judge Crane talked about how it's a rural area. There are some ranchitas and a few stores or whatever, but not subdivisions and things of that nature. So it's a long-distance travel. And so that influenced the conclusion that she had passed the sign. Correct. And knew about the sign. That's correct. The passing the sign is relevant to the statute requires knowledge that this is a violation. Correct. But not specific knowledge. Right. But just the knowledge. I mean, getting back to my hypo about being in Dallas, I don't think driving in the left lane in Dallas is the same thing as driving in the left lane on some long journey somewhere because there you've got so much traffic, you need all the lanes just to hold the traffic. So you may or may not be passing somebody to your right. You just have to be, there's just so many lanes because you have so much traffic. And that's a different world, if you will, than the highway where there's maybe no cars for miles and you're just driving alone and they don't want you hanging out in the left lane. They also don't want you driving slowly in the left lane and blocking people, which is what they're trying to, like an express highway where you're trying to get places. Is this making sense? Yes. So then the passing the sign isn't the crime so much as the putting you on notice that you're now in this zone where you need to stay in the right lane unless you're passing. Right. And a lot of this flows from the Court of Criminal Appeals decision in Abney. And in Abney there was conflicting testimony. And the trooper testified that the sign was 15, 20 miles away and the public defender's investigator said it was 27. And the opinion is a little fluid, if you will, when it's discussing the distance. But the fact of the matter is it's important not to lose sight of the fact that in Abney the person that was ultimately pulled over was getting ready to make a left-hand turn. That's when he was pulled over. There's zero indication in this situation of that getting ready to occur. There's no blinker on. There's nothing like that. And in fact, as I said earlier, what four working principles, for lack of a better word, we have here is totality of the circumstances, factual intensity, the light most favorable to the government, and deference. Let's get back to the scenario about the passing. So if she saw up ahead an emergency vehicle with its lights on, on the right-hand shoulder, then the law would require her either to slow down or to get into the left lane. Is that right? Correct. 20 miles. She has to, I just learned this myself, that she either has to slow down 20 miles below whatever the posted speed limit was or move to the left lane. So at that point, at the point that she saw and was passing the stopped emergency vehicle. Totally legal. She could stay in the left lane. Absolutely. No question about it. All right. And then you have the. So the question is then, at what point did it become unlawful for her to be in the left lane and how long was she in the left lane at whatever it was, 70, 75 miles an hour? That's correct. I mean, that that's certainly part of the analysis, let's say. I mean, that's not. What do the facts tell us about answering that question? Well, as I said before, I totally agree that when she was passing the other officer, that was completely legal. And as I said, also said before, that we see the truck crossing the highway. Now he goes immediately over to the shoulder. That's debatable, right? At what point you move over because he's moving to the shoulder. But the fact of the matter is he safely reaches the full shoulder and she could move to the right lane. And if you look at the video, at the end of the video, I can't say that it's conclusive, but it does appear that once that like the HEV trucks and whatever that are passing to Officer Vivero and the women, it appears that some of them or maybe all of them, maybe not all, I shouldn't say that, but are moving then back over to the right lane. So what, it's not just a matter of timing, although the Supreme Court, excuse me, the Court of Criminal Appeals and Jag and Nathan talked about just 20, 22 seconds was enough. However, I understand in that case that, you know, that they saw the sign was right there. And that's the difference in all of these cases. And that's why it is a factual intensive inquiry. Is nothing fits into some neat box. If in fact, and we also know that Officer Vivero here testified that she had already presumably passed at least two signs. He wasn't sure about the third one. And if you look at Highway 281, which I think this Court can in relation to, I don't think it's a judicial notice, but a common sense thing. It goes south, well, north-south from Falfurria. And she's traveling south. And there's no major city in between there. And the Court, as I said before, recognized that as much. And all these factors come into play. For example, in Castillo, this Court recognized that there were medians, there were entrance ramps and county roads and things of that nature, and it wasn't troubled by it. It felt that based on the reason, you know, the Court had formulated reasonable suspicion. And one of the, I believe it's one of the Texas courts, had talked about one difference is you have to look at these things in real time through the officer's eyes, so to speak, as opposed to doing a video, backing it up, counting the seconds as you did, as I did. And how reasonable suspicion doesn't work that way. Instead, what we have is an officer making real-time decisions. And here what we also have is a clearly erroneous standard, and as the Supreme Court has said, you need to, excuse me, the Court needs to defer to the local judges and law enforcement in their assessment of the regular facts. The sign that we're talking about, again, correct me if I'm wrong, said left lane for passing only, is that right? That's what's required by law for it to say. Okay. So left lane for passing only, are those the words? Yes, it's statutorily. It's a statute. All right. Is there any doubt that she was in the left lane because she was passing vehicles that were in the right lane, or that she was passing by a stopped emergency vehicle with its lights on? If I understand what you're saying, I totally agree. She wasn't just cruising around in the left lane just because that seemed right, or the pavement was smoother or anything like that. She was in the, she got into the left lane and stayed there for at least those two different reasons. Yes. For the purpose of passing. For the purpose of passing, which was legal, when she passed the other officer, and, you know, the issue about the truck, and then by law she was required to get over, and it doesn't matter what she thinks or doesn't think. That's not the inquiry. That's not the test. The focus is on what the officer reasonably believed. So it doesn't matter what she said. Now again, going back to Abney, because that's the Court of Criminal Appeals case, it was different because objectively the defendant there was going to turn left, and that's, so the facts there were a little bit different. If you look at all these cases that have come out of this court, the lower courts in Texas and the Court of Criminal Appeals, they're all a little bit different. And so you get back to the totality of the circumstances and the factual inquiry. And the more fact-intensive it is, the more we have to defer to the district court. That's right. And the U.S. Supreme Court says so. And turning to no Fourth Amendment violation in relation to the duration and scope of the stop. Before we get off of this fascinating traffic issue, so I'm still trying to determine, what in your view does the record show about how much longer she was in the left lane than she should have been, measured either by how many tenths of a mile or how many seconds or both? Well, I tried to be as objective as I could be when I watched the video and I replayed it. And what I saw was it was approximately at 135 on the video, the truck reaches, the pickup truck reaches the, well, let me start from the beginning. At 113, she passes. And I unequivocally see that law enforcement has somebody pulled over at 133. But I could see the lights ahead in the video. She passes law enforcement and the truck crosses the highway at 135. The truck reaches the shoulder at 148 and turns. And at 2, she's pulled over. So it is, it is a fairly compact part of, time, time. About 12 seconds. 12, yeah, give or take. And I tried to err in the favor of her, but of course the court is more than welcome to And the good news about this video is it's in the very beginning of the video. Because the video, if you pause it, you have to watch it again. You can't just rewind it for whatever reason. So that's the timing of it. But as I said before, when he first sees her or notices her, it's about 7 to 8 miles from the undisputed location of the sign. And she's in the right lane. And that's where it all starts. Of course, we don't see anything, we don't see her behind her. So in relation to the Fourth Amendment. And between that first point when he saw her and the sign, is there an exit? The record is not very well developed on that. But we know that there are turn offs or medians or whatever you want to call them. It's like Castillo. Of course, not exactly like Castillo. But there are opportunities to cross medians and get on and off. But as I said before, the area is very... I don't know if there was an opportunity within those 7 miles. I believe there is, yes. Yes. What I think you're saying is, it's not a limited access... That's exactly right. Even though it's four lanes with a median, it's not limited access where you can only get on at the exits or entrances. Well, there are turnarounds. But the judge found that it was unlikely that she had turned around. And I can't remember now, I think it was just the officer, it might have been the judge too, but talked about how this is a highway that's used for long distance travel. It's not 45, it's not I-10 in Houston or any of those. It's a rural area. And if you look at the map, you can see that. So again, I realize anything's possible, but was there something in those 7 miles that most people would exit for? I mean, put it another way, obviously if I own the farm and there's farmland, then maybe I'm exiting and that's fine. But the typical person traveling would only exit when there's some area with gas stations and restaurants and that sort of thing. Whether or not it's limited access or it's turnarounds, was there anything to access or turn around for? It was more during cross-examination that that came out, but there was no indication that had happened. And so the fact of the matter is, there is no evidence either way on that. But the judge felt, based on the totality of the circumstances, that that in fact had not happened. He used the word. It would be reasonable for the police officer to think that hadn't happened. Correct. That's where I'm trying to go with it. Right. Because that's whose eyes count, is what he's seeing, his experience, and he's the one that said it's for long distance travel. And in relation to the duration of the stop, what we have is he's talking to the, I mean, he leans in on the passenger side, and he's talking. There's also a transcript of the video, which is obviously much easier to read. That doesn't make sense to understand, rather. But she ultimately gets out of the car. He puts her out of the car because she doesn't have the insurance. And so they're going to go check it on the patrol car. He can look it up there. And that's how she ultimately winds up outside of the vehicle. And he's talking to the passenger, who apparently is looking straight, is all nervous. And he asks itinerary-type questions, including how they met. And she says, passenger says that they met through Facebook, even though they lived in different towns and what have you. And ultimately, one of the things that Rodriguez has said, no, their husbands were in prison and they met through visitation. And the trooper testifies that from the get-go, he thinks something's amiss. I see my time is up. And unless the court has any additional questions. You actually have the yellow light, but that's up to you. I only saw 28 seconds. So you have that going on. You also have the no luggage issue. And he even says, when he brings Ms. Rodriguez in the car because of the hot sun, he says, you'd be more comfortable or something like that. He says, both of you are nervous. He's having her, and she starts volunteering. And while Mr. Turley talks about how it's a meandering question, I think if the court either listens to the video or looks at the transcript, you'll see a lot of the times he's just following up on her answers to questions, which are answers in which she volunteers various information. And. All right. Thank you. Thank you. Mr. Turley for rebuttal. The court in Abney noted that the sign in question, left lane for passing only, was one that was one of notice. Sometimes we refer to the left lane as the passing lane. And so the sign is a restriction on passing. We also sometimes refer to the left lane as a fast lane. And it is specifically not allowed to exceed the speed limit in the left-hand lane. And again, as I noted, there was no issue of speeding here. It was simply that of being in the left-hand lane. As the court heard, and you can see from the record, even the district judge noted that the trooper was, quote, a little quick on the draw. The number that I believe I saw in the transcript is 13 seconds. Certainly a viewing of the video would show that it was a very short period of time. There's not a question about the location of the sign. There's not a question about the time when the trooper observed her, because he stated in the record that he could see that she was behind him for about two miles. And then at some point, she passed him. Thirteen seconds later, he pulled her over. And so would just confirm to the court that that 13-second period from a sign 12 miles away is not reasonable suspicion for the initial stop. By itself, it is not. And as this court noted in Castillo following Abney, that the presence of a credible alternative reason for being in the left lane, in which here we have two, that being, you know, moving on over to avoid the stopped emergency vehicle, in addition to moving and avoiding a crossing vehicle in the area, was not reasonable suspicion for the initial stop. And passing the first officer, actually. There's three different reasons. The, I personally would argue that it is no violation to pass. No, that was a friendly comment, that there's three different reasons that she was in the left lane. The, although I would note that the Texas DPS does tend to drive very slowly in the part of its patrolling, particularly in this area. And if it helps the court take judicial notice of the fact of this area coming into Edinburgh, Texas, where the violation occurred, as the court noted, it is not a limited access highway. It is a four-lane road with median. There are houses on the side in some places. There are crossing streets. There are ways to take a right. There is not much, I will point out that there is not much commercial activity in this area. The, although if you were to go five miles down the road, it starts to change as you get closer. In the direction she was going? In the southbound direction. But she wasn't there yet? Pardon me? She wasn't where the action is yet? No. Additionally, I would note that that did raise the issue of the reasonable suspicion for the continued questioning after the stop, and would note that the court can see from the transcript as well as the audio recording of that, that the questioning was in my view meandering and somewhat unfocused, and the, was simply designed to prolong the stop to get her to admit to something that there was probably a suspicion of. That's all I have. Thank you. All right. Thank you, Mr. Turley. Your case is under submission. We noticed that your court appointed you. We want to thank you for your willingness to take the appointment and for your good, strong work on behalf of your client. Yes, sir. Thank you. Next case, Cruz Tellez v.